UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-20935-CIV-LENARD

**YANEITSY ROSETE, PERSONAL**
**REPRESENTATIVE OF THE ESTATE**
**OF DANIEL ALLEN KEMPF,**

   Plaintiff,

v.

**CITY OF HOMESTEAD**,

et al.

   Defendants.

_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court on the Defendants' City of Homestead and Schelisa Gilpin-Braithwaite's Motion for Summary Judgment ("MSJ") (D.E. 61), filed by Defendants City of Homestead ("Homestead") and Officer Schelisa Gilpin-Braithwaite ("Gilpin") (collectively "Defendants") on June 6, 2025. Concurrently, Defendants filed City of Homestead and Schelisa Gilpin Braithwaite's Statement of Material Facts in Support of Motion for Summary Judgment ("Defendants' Facts") (D.E. 59). On June 23, 2025, Plaintiff Yaneitsy Rosete[1] ("Plaintiff") filed Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Response") (D.E. 69), and

---

[1] Plaintiff's Facts contains Plaintiff's responses to the facts averred in Defendants' Facts, as well as Plaintiff's additional facts. *See* Pl.'s SMF., D.E. 68.

Plaintiff's Statement of Material Facts in Response to Defendants' Statement and Plaintiff's Additional Material Facts ("Plaintiff's Facts") (D.E. 68).[2] On June 30, 2025, Defendants filed their Reply in Support of Motion for Summary Judgment ("Reply") (D.E. 76) and Reply to Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("Defendants' Reply to Plaintiff's Facts") (D.E. 77).[3] This matter is now ripe for adjudication. Having reviewed the MSJ, Plaintiff's Response, the Reply, Defendants' Facts, Plaintiff's Facts, Defendants' Reply to Plaintiff's Facts and the docket, the Court finds as follows.

## I.      Background

### a.  Factual Background

This case concerns a tragic set of facts that unfolded on October 22, 2023, which resulted in the death of Daniel Allen Kempf ("Kempf"). For completeness, the Court begins its recitation with events starting one month before, on September 23rd. The following facts are either undisputed by Plaintiff in Defendants' Facts or are asserted by Plaintiff in Plaintiff's Facts. The Court only considers the facts that are asserted by Plaintiff in Plaintiff's Facts and the facts Plaintiff agrees are undisputed in Defendants' Facts. The Court then draws all reasonable inferences from these facts in the light most favorable to the Plaintiff.

---

[2] Plaintiff is the personal representative of the Estate of Daniel Allen Kempf.
[3] The MSJ, Plaintiff's Response, and the Reply all contain arguments of law. *See* Defs.' Mot. Summ. J., D.E. 61; Pl.'s Resp., D.E. 69; Defs.' Reply, D.E. 76. Defendants' Facts, Plaintiff's Facts, and Defendants' Reply to Plaintiff's Facts contain the parties' statements of material facts. *See* Defs.' SMF, D.E. 59; Pl.'s SMF, D.E. 68; Defs.' Reply to Pl.'s SMF, D.E. 77.

Kempf was a twenty-four-year-old man who suffered from both depression and schizophrenia and took medication for the latter condition.[4] Defs.' SMF at ¶4, D.E. 59; Pl.'s SMF at ¶4, 98, D.E. 68. On September 23, 2023, Kempf was reported missing after leaving behind a suicide note, and the Miami-Dade Police Department ("MDPD") created an incident report and entered Kempf as missing and endangered. Defs.' SMF at ¶2, 37, D.E. 59; Pl.'s SMF at ¶2, 37, 98, D.E. 68.

On October 22, 2023, at approximately 3:23 p.m., the Officers responded to a call to locate a missing person, whom they later identified as Kempf. Pl.'s SMF at ¶97, D.E. 68. The Officers were told that Kempf was possibly armed with a knife and had previously left a suicide note. Defs.' SMF at ¶7, D.E. 59; Pl.'s SMF at ¶7, D.E. 68. Kempf was also reported to have a history of schizophrenia and depression. Pl.'s SMF at ¶98, D.E. 68. At least four officers were dispatched, including Gilpin, Officer Giovanni Nazario ("Nazario"), Officer Joseph Rivera ("Rivera"), and Lieutenant Jorge Cruz ("Cruz") (collectively "Officers"). Gilpin, Nazario, and Rivera were wearing body-worn cameras (hereinafter referred to as "Gilpin Camera," "Nazario Camera," and "Rivera Camera," individually, or "Cameras" collectively).

Nazario was the first officer to arrive at the Residence and spoke with Caridad Rosete, ("Grandmother") Kempf's grandmother. Defs.' SMF at ¶8-9, D.E. 59; Pl.'s SMF at ¶8-9, D.E. 68. The Grandmother told Nazario that when she and Plaintiff came to see Kempf that morning, he was in bed, and they both saw that he had a knife under his pillow.

---

[4] Apparently, Kempf had not taken medication in the month preceding his death. Defs.' SMF at ¶4, D.E. 59; Pl.'s SMF at ¶4, D.E. 68.

Defs.' SMF at ¶13 14, D.E. 59; Pl.'s SMF at ¶13, 14, 106, 107, D.E. 68. Additionally, the Grandmother stated that Kempf had made threats to harm himself upon his return to the Residence the previous day. Defs.' SMF at ¶13, D.E. 59; Pl.'s SMF at ¶13, D.E. 68. Nazario relayed this information to the other Officers. Defs.' SMF at ¶14, D.E. 59; Pl.'s SMF at ¶14, D.E. 68. Nazario concluded that Kempf was mentally ill, and both Nazario and Gilpin understood Kempf was suicidal. Pl.'s SMF at ¶109-110, D.E. 68.

Prior to entering the Residence, the Officers were concerned that Kempf might harm himself and discussed how to proceed. Defs.' SMF at ¶20, 22, D.E. 59; Pl.'s SMF at ¶20, 22, D.E. 68. Cruz expressed his concern that the situation may become violent. Defs.' SMF at ¶19, D.E. 59; Pl.'s SMF at ¶19, D.E. 68. Gilpin stated that she did not want to push inside the Residence. Pl.'s SMF at ¶123, D.E. 68. Nazario spoke, by phone, with the Plaintiff, who said Kempf had been missing but returned to the Residence the previous day. Defs.' SMF at ¶26-30, D.E. 59; Pl.'s SMF at ¶26-30, D.E. 68. Ultimately, the Officers decided to enter the Residence in an attempt to make contact with Kempf. *Id.* at ¶124. Before entry, Gilpin informed Rivera that he would be responsible for tasing Kempf, and if "anything goes bad, [she would] take lethal." *Id.* at ¶119, 120.

The Officers discussed how to contact Kempf. Defs.' SMF at ¶21-22, D.E. 59; Pl.'s SMF at ¶21-22, D.E. 68. Following protocol for endangered and missing persons, they decided to "go the 36 route" and tell Kempf that they need to see him to make sure he is in

good health and has not harmed himself.[5] Defs.' SMF at ¶38-39, D.E. 59; Pl.'s SMF at ¶38-39, D.E. 68. The Officers unlocked the front door of the Residence with the key the Grandmother had given them and stood by the open doorway.[6] Defs.' SMF at ¶16, 40-41, D.E. 59; Pl.'s SMF at ¶16, 40-41, D.E. 68. The Officers identified themselves as Homestead police officers and asked Kempf to come out and talk to them. Defs.' SMF at ¶41, D.E. 59; Pl.'s SMF at ¶41, D.E. 68. There was no response from Kempf. Defs.' SMF at ¶42, D.E. 59; Pl.'s SMF at ¶42, D.E. 68. For several minutes, the Officers repeated the message that they needed to know if Kempf was alright and as an alternative to actual visual contact with the Officers, Kempf could instead bang on the door. Defs.' SMF at ¶43, D.E. 59; Pl.'s SMF at ¶43, D.E. 68.

The Officers entered the Residence, with their guns drawn, and searched the house room by room.[7] Pl.'s SMF at ¶121, 122, D.E. 68. While searching the house, the Officers continued to yell for Kempf to either identify himself or give any type of signal to respond to the Officers' request. Defs.' SMF at ¶45, D.E. 59; Pl.'s SMF at ¶45, D.E. 68. Again, there was no response from Kempf. Defs.' SMF at ¶46, D.E. 59; Pl.'s SMF at ¶46, D.E. 68.

---

[5] The Officers confirmed with dispatch that Kempf was listed at "36," meaning that Kempf was missing, and "44," meaning that Kempf was suicidal. Defs.' SMF at ¶37, D.E. 59; Pl.'s SMF at ¶37, D.E. 68.

[6] The Grandmother is the legal owner of the Residence. Defs.' SMF at ¶12, D.E. 59; Pl.'s SMF at ¶12, D.E. 68.

[7] While searching the Residence, the Officers encountered a bulletproof vest. Defs.' SMF at ¶47, D.E. 59; Pl.'s SMF at ¶47, D.E. 68.

The Officers then decided to enter the Master Bedroom. Defs.' SMF at ¶49, D.E. 59; Pl.'s SMF at ¶49, D.E. 68. Before entering the Master Bedroom, Gilpin loudly stated, "Daniel, come out with your hands up, open handed!" Pl.'s SMF at ¶127, D.E. 68. The Officers pushed the Master Bedroom door open, but it swung back to a partially closed position. *Id.* at ¶128. The Master Bedroom door "appeared to be blocked by debris." *Id.* at 129.

The Officers looked inside the Master Bedroom and saw there "was clutter throughout the room and did not see anyone." Defs.' SMF at ¶61, D.E. 59; Pl.'s SMF at ¶61, D.E. 68. They then made their way into the Master Bedroom; however, due to "the clutter in the room the door would not open all the way." Defs.' SMF at ¶62-63, D.E. 59; Pl.'s SMF at ¶62-63, D.E. 68. The Officers continued to call out for Kempf. Defs.' SMF at ¶63, D.E. 59; Pl.'s SMF at ¶63, D.E. 68. Kempf did not respond to the Officer's commands. Defs.' SMF at ¶64, D.E. 59; Pl.'s SMF at ¶64, D.E. 68. Gilpin went to the left side of the room by the foot of the bed. Pl.'s SMF at ¶131, D.E. 68. Rivera went to the right side of the room, checked the closet  and then stationed himself in the congested closet doorway which was closest to the bathroom. Defs.' SMF at ¶66, D.E. 59; Pl.'s SMF at ¶66, 131 D.E. 68. Nazario stood by the Master Bedroom door behind Rivera. Pl.'s SMF at ¶131, D.E. 68.

Kempf stepped out of the adjoining bathroom, naked, a towel around his waist and armed with a knife pointed at his chest and yelled "shoot" at the Officers. Defs.' SMF at ¶73, D.E. 59; Pl.'s SMF at ¶73, 133-134, D.E. 68.. Officer Nazario yelled, "He has the knife on him." Defs.' SMF at ¶75, D.E. 59; Pl.'s SMF at ¶75, D.E. 68. The Officers repeatedly said, "don't do it!" and "let me see your hands." Defs.' SMF at ¶76, D.E. 59;

6

Pl.'s SMF at ¶76, 137, D.E. 68. Kempf was 5.0 feet from Rivera, who had to lean out of the closet. Defs.' SMF at ¶78, D.E. 59; Pl.'s SMF at ¶78, 140, D.E. 68. Rivera shot Kempf with his taser. Pl.'s SMF at ¶139, D.E. 68. Prior to the first taser shot, Kempf did not lunge forward, and the knife blade was always pointed toward Kempf. *Id.* at ¶141. While being tased, Kempf remained standing, kept hold of the knife, and moved the knife about his torso. *Id.* at ¶151, 152. After being tased, Kempf fell back against the bookcase. *Id.* at ¶154.

After the five-second cycle of the taser wore off, Kempf "naturally moved forward" and "leaned forward toward Rivera holding the knife at a different angle at himself." *Id.* at ¶163-164. Kempf's body bent slightly at the waist due to the effects of the taser. *Id.* at ¶166. At no time did Kempf verbally threaten any of the Officers or lift the knife in a threatening or menacing manner toward any of the Officers. *Id.* at ¶183-185. Kempf was now 4.7 feet from Rivera. *Id.* at ¶169. Rivera fired his taser at Kempf a second time, again striking Kempf. *Id.* at ¶168. Gilpin fired the fatal gunshot .037 seconds after Rivera fired the second taser shot. *Id.* at ¶176. The time period, from when Gilpin first saw Kempf to when she shot Kempf, causing his death, spanned roughly 15 seconds. Defs.' SMF at ¶94, D.E. 59; Pl.'s SMF at ¶94, D.E. 68.

### b. Procedural Background

Plaintiff filed the Amended Complaint ("Amended Complaint") (D.E. 18) on May 15, 2024, alleging two counts: (I) "Wrongful Death: Battery/Excessive Force" against Homestead; and (II) 42 U.S.C. § 1983 claim for violating Kempf's rights under the Fourth

and Fourteenth Amendments against Gilpin and John Doe.[8] Am. Compl. at 7-10, D.E. 18. Count II was dismissed by the Court as to John Doe. Order, D.E. 24. Count I, a Florida state law claim against Homestead, does not specify which state law the claim is brought under. *See* Am. Compl. at 7, D.E. 18. Nevertheless, the Amended Complaint alleges that by shooting and killing Kempf, Gilpin employed excessive force, and that Homestead, as Gilpin's employer, is responsible for her actions. *Id.* Count II alleges that by shooting and killing Kempf, Gilpin deprived Kempf of his Fourth and Fourteenth Amendment rights in violation of § 1983. *Id.* at 9.

On June 6, 2025, Defendants jointly filed their MSJ, and Defendants' Facts arguing that no genuine dispute of material facts exists between the parties, and that they were entitled to judgment as a matter of law on both Counts of the Amended Complaint. *See* Defs.' Mot. Summ. J., D.E. 61. The MSJ argues that Gilpin's actions were taken within the scope of her discretionary authority, her actions were objectively reasonable, and there was no violation of clearly established law. *Id.* at 3-15. Thus, the MSJ asserts that Gilpin is entitled to qualified immunity as to Count II. *Id.* The MSJ further alleges state law defenses as to Count I. *Id.* at 15-17. In the alternative, the MSJ seeks summary judgment on certain claimed damages, such as lost net accumulations and economic damages for lost support and services on behalf of the survivors. *Id.* at 17-20.

---

[8] Despite the Amended Complaint alleging "Wrongful Death: Battery/Excessive Force" against Homestead, Plaintiff sets forth a *Monell* claim instead and does not allege facts to support the count as titled. Am. Compl. at 7-10, D.E. 18; *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, (1978). Accordingly, the Court proceeds with its analysis on the assumption that Plaintiff intended to assert a *Monell* claim.

On June 23, 2025, Plaintiff filed both Plaintiff's Response to the MSJ and Plaintiff's Facts.[9] Pl.'s Resp., D.E. 69; Pl.'s SMF, D.E. 68. Plaintiff's Facts identifies the disputed and undisputed facts in Defendant's Facts, as well as setting forth her own asserted facts. *See* Pl.'s SMF, D.E. 68. Plaintiff's Response asserts that Gilpin violated Kempf's clearly established constitutional rights. Pl.'s Resp. at 7-16, D.E. 69. Plaintiff argues that Kempf was not threatening the Officers, and that the deadly force employed by Gilpin was unreasonable in light of the totality of the circumstances.[10] *Id.* at 9-14. Plaintiff further contends that his constitutional rights, to be free from unreasonable search and seizure and the unlawful use of excessive force, were clearly established at the time of the shooting. *Id.* at 14-16. Additionally, Plaintiff argues that Homestead's defenses to Count I are inapplicable. *Id.* at 16-17. However, Plaintiff's Response does not oppose granting summary judgment on the damages claimed in the Amended Complaint. *Id.* at 18-19.

Defendants filed both their Reply and Defendants' Reply to Plaintiff's Facts on June 30, 2025. Defs.' Reply, D.E. 76; Defs.' Reply to Pl.'s SMF, D.E. 77.

## II. Applicable Law

### a. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere

---

[9] Plaintiff does not contest that Gilpin was acting within her discretionary authority throughout the fatal encounter with Kempf. Pl.'s Resp. at 4 n.1, D.E. 69.

[10] In Florida, "deadly force by a law enforcement or correctional officer" is defined as "force that is likely to cause death or great bodily harm[.]" Fla. Stat. Ann. § 776.06 (West)

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). "In qualified immunity cases, this usually means adopting…the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. "But where the [evidence in the record] does not clearly depict an event or action, and there is evidence going both ways on it, we take the [non-moving party's] version of what happened." *Shaw v. City of Selma*, 884 F.3d 1093 n.1 (11th Cir. 2018) (citation omitted).

10

### b. *Violations of Constitutional Rights*

A plaintiff may bring a § 1983 claim against a public official defendant alleging a violation of constitutional rights. 24 U.S.C. § 1983. In a § 1983 case, "it is necessary to isolate the precise constitutional violation with which he is charged." *Baker v. McCollan*, 443 U.S. 137, 140 (1979).

A claim that law enforcement officials exercised excessive force is determined under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "The Fourth Amendment 'reasonableness' inquiry is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 387. Thus, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-397. The Court's determination of whether a constitutional right has been violated is inevitably highly fact-driven. *See Scott*, 550 U.S. at 383 ("[I]n the end we must still slosh our way through the factbound morass of 'reasonableness.'").

The determination includes the following factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; (3) whether he was actively resisting arrest or attempting to evade arrest by flight;

(4) the need for the application of force; (5) the relationship between the need and amount of force used, and (6) the extent of the injury inflicted.'" *Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1239 (11th Cir. 2024). However, "neither the Supreme Court nor this Court has ever held that *all* of the *Graham* factors must be present for an officer's actions to be reasonable; indeed, in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others." *Cantu v. City of Dothan, Alabama,* 974 F.3d 1217, 1229 (11th Cir. 2020). (quoting *Rockwell v Brown*, 664 F.3d 985 at 992 (5th Cir. 2011)).

However, a set of facts does "not fit neatly within the *Graham* framework" where the person whose rights have been violated is not a suspect. *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005); *Id.* at 1160 ("Because this situation does not involve a criminal arrest, our facts do not fit neatly within the *Graham* framework. Furthermore, because Florida does not recognize attempted suicide as a crime…it is impossible for this court to measure the 'severity of the crime at issue.'").

An examination of the issue of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The purpose of qualified immunity is to protect officials from the chilling effect that a fear of personal liability would create in carrying out their discretionary duties…

12

'protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012).

In order to assert a defense of qualified immunity, the "defendant public official must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991). "To establish that the challenged actions were within the scope of [her] discretionary authority, a defendant must show that those actions were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998).

"Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions 'violated clearly established constitutional law.'" *Courson,* 939 F.2d at 1487. A plaintiff overcomes this burden by showing: (1) that a constitutional right was violated; and (2) the constitutional right was clearly established at the time of the violation. *See Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022) ("To overcome a qualified immunity defense where the defendant acted within his discretionary authority, the plaintiff must show that the defendant's actions not only violated one or more constitutional rights, but also that it was clearly established at the time that those specific actions did so.").

A plaintiff must also show that the right was "clearly established" in three ways: (1) by pointing to a materially similar decision of the Supreme Court, of the Eleventh Circuit,

or the Florida Supreme Court; (2) by establishing that a broader, clearly established principle should control novel facts; or (3) by showing that the facts so obviously violate the Constitution that prior case law is unnecessary. *Powell*, 25 F.4th at 920. "Under the first and second of these methods, the plaintiff must rely on decisional law… Under the second and third methods, we look for 'obvious clarity': a principle or provision so clear that, even without specific guidance from a decision involving materially similar facts, the unlawfulness of the officer's conduct is apparent." *Id.*

## III.   Discussion

### a.  *Gilpin is Entitled to Qualified Immunity and Summary Judgment is Granted as to Count II*

As stated previously, to assert a claim for qualified immunity, a public official defendant must first show that she was acting within the scope of her discretionary authority when the alleged wrongful acts occurred. *Courson*, 939 F.2d at 1487. Here, Defendants allege, and Plaintiff does not contest, that Gilpin was acting within her discretionary authority when she shot and killed Kempf. Defs.' Mot. Summ. J. at 5-6, D.E. 61; Pl.'s Resp. at 4 n. 1, D.E. 69. The Court agrees and therefore finds that Gilpin was acting within the scope of her discretionary authority as a Homestead police officer. Therefore, the burden shifts to Plaintiff to show both that Gilpin violated Kempf's constitutional rights to be free from unreasonable search and seizure, that the use of deadly force was excessive and that those rights were clearly established at the time of the alleged violation. *Courson*, 939 F.2d at 1487.

### 1. *Gilpin did not Violate Kempf's Fourth Amendment Rights*

As set forth by the Supreme Court in *Graham*, and expanded upon by the Eleventh Circuit in *Acosta*, a district court should include a number of factors in its determination of whether the defendant public official's actions were objectively reasonable. *Graham,* 490 U.S. at 396; *Acosta*, 97 F.4th at 1239. In *Mercado*, allegations of excessive force by police officers when called to perform a welfare check on a mentally ill individual do not fit neatly into the *Graham* framework. *Mercado*, 407 F.3d at 1157. Because attempted suicide is not a crime under Florida law, the Court cannot ascribe a level of severity to Kempf's "crime." *Id*.

Instead, as the Eleventh Circuit has done in similar cases, the Court looks primarily at the threat posed by Kempf to the Officers and whether the force used by Gilpin was reasonable. *See Shaw*, 884 F.3d at 1099 ("The decisive [*Graham* factor] here is the threat of physical harm that Shaw posed at the time he was shot. The issue is whether an officer in Williams' position reasonably could have believed that Shaw posed a serious threat when he was close to and advancing on Williams, had a hatchet in his hand, and had ignored more than two dozen orders to drop the weapon."); *See also Mercado*, 407 F.3d at 1157 ("In determining whether the officers' force was reasonable, we must determine 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'"). Further, not all of the factors need weigh in the defendant public official's favor, and "it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others." *Cantu*, 974 F.3d at 1229.

Therefore, the Court examines the facts contained in Plaintiff's Facts and the undisputed facts within Defendants' Facts to determine whether Gilpin's use of deadly force was a reasonable response to a serious threat Kempf posed to Rivera. *See Shaw*, 884 F.3d at 1099. As stated previously, the Court takes the Defendant's undisputed facts and Plaintiff's asserted facts as true and draws all reasonable inferences in the light most favorable to Plaintiff to determine whether Gilpin violated Kempf's constitutional rights. Based on this detailed examination, and after considering the totality of the circumstances in this case, the Court finds that Gilpin did not violate Kempf's constitutional rights.

The facts asserted or agreed to by Plaintiff demonstrate that prior to their encounter with Kempf, the Officers followed protocol by attempting to make contact with Kempf. Outside the residence, the Officers discussed going the "36" route, meaning that they would attempt to make contact with Kempf to confirm that he was in good health and had not harmed himself. Defs.' SMF at ¶38-39, D.E. 59; Pl.'s SMF at ¶38-39, D.E. 68. For several minutes, the Officers stood by the door to the Residence and called out for Kempf to come out or give a signal that he was well. Defs.' SMF at ¶41, 43, D.E. 59; Pl.'s SMF at ¶41, 43, D.E. 68. After receiving no response, the Officers entered the Residence and searched each room. Defs.' SMF at ¶44, D.E. 59; Pl.'s SMF at ¶44, D.E. 68. As the Officers moved through the Residence, they continued to yell for Kempf to either identify himself, or give any type of signal to respond to the Officers' request. Defs.' SMF at ¶44-45, D.E. 59; Pl.'s SMF at ¶44-45, D.E. 68.  There was no response from Kempf. Defs.' SMF at ¶46, D.E. 59; Pl.'s SMF at ¶46, D.E. 68.

Here, the Officers suddenly found themselves face-to-face with an armed, mentally ill man, who had not complied with the Officers' directives, and who kept hold of a steak knife, even after being tased. Pl.'s SMF at ¶133, 138, 164, D.E. 68. Rivera was inside a congested closet doorway in a cluttered bedroom, and Nazario was standing by the only exit to the Master Bedroom, which was apparently blocked by debris. *Id.* at ¶129, 131, 140. Kempf, after the first taser shot, was 4.7 feet from Rivera. Accordingly, considering the totality of the circumstances, including Kempf's continuous hold on the knife, the Court finds that Kempf could have, in a second or two, turned the knife on Rivera, who was without an apparent path of retreat, and attacked him, causing serious injury or death.

The Court further finds that Gilpin was not required to wait and see if Kempf, having recovered from the effects of the first taser shot, would strike Rivera with the knife. *See Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."); *see also Foulke*, No. 22-13942, 2024 WL 2761778, at *7. ("Indeed, when a suspect has a weapon 'available for ready use,' law enforcement is 'not required to wait and hope for the best.'").

Additionally, Plaintiff asserts that "[d]uring the entire encounter with Kempf, from the entry into the bedroom until the gunshot which killed him, the Officers never ordered Kempf to drop his knife; never warned Kempf that if he did not drop the knife, he would be tased; and never advised Kempf that failure to drop the knife would result in his being shot." Pl.'s Resp. at 7, D.E. 69. However, Eleventh Circuit precedent establishes no hard

and fast rule that required the Officers to warn Kempf about the exact nature of the consequences of his failure to comply with their commands. *See Powell*, 25 F.4th at 922 ("On the subject of warnings, we 'have declined to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing — particularly where such a warning might easily have cost the officer his life.'").[11]

The Court instead looks to whether the Officers had time and opportunity to warn Kempf. *Cantu*, 974 F.3d at 1231. In *Cantu*, the decedent, while struggling with police, put his hand on one officer's taser. *Id.* at 1226. Another officer at the scene shot the decedent five seconds later without warning, and claimed she feared for the other officer's life should the decedent use the taser against the officer. *Id.* The Eleventh Circuit held that although there was not time or opportunity for the officer to provide a deadly force warning to the decedent, there was no cause to shoot the decedent, as a taser is not generally a deadly weapon and thus the other officer's life was not in peril. *Id.* at 1231.

Like *Cantu*, the present case involved a brief and tense exchange between the police and an uncooperative and erratic decedent. In both cases, police did not have time or opportunity to provide a deadly force warning to the respective decedents. Unlike *Cantu*,

---

[11] Additionally, Plaintiff dedicates several detailed paragraphs in Plaintiff's Facts emphasizing the inability of schizophrenic persons to control their emotions, perceive or understand reality, and the propensity of schizophrenic persons to react negatively towards uniformed police officers or otherwise act inappropriately. Pl.'s SMF at ¶100-104, D.E. 68. However, far from establishing the unreasonableness of Gilpin's actions, these facts underscore the potential danger posed by Kempf to the Officers.

in the present case, Kempf was armed with a deadly weapon and was close and getting closer to one of the Officers. Pl.'s SMF at ¶140, 163-164, 169, D.E. 68

The time from when Gilpin first saw Kempf to when he was fatally shot spans roughly fifteen seconds, including the five seconds of which Kempf was affected by the first taser shot. Defs.' SMF at ¶94, D.E. 59. In those fifteen seconds, Kempf entered the Master Bedroom from the bathroom with a steak knife in his hand while shouting "shoot" and was 5.0 feet from Rivera before he was tased. Pl.'s SMF at ¶73, 138, 140, 163-164, D.E. 68. After being tased, he was 4.7 feet from Rivera. *Id*. at ¶169. In the time it would take the Officers to issue an explicit deadly force warning, Kempf could have turned the knife outward and stabbed Rivera.

Further, the Court notes that in addition to the fact that warnings that force will be used are required only when feasible, there is also no precise requirement for what words a warning needs to include. The Officers were only required to give "*some* warning about the possible use of deadly force, if feasible." *Vaughan v. Cox*, 343 F.3d 1323 at 1330 (11th Cir. 2003) (emphasis added). In another case, the Eleventh Circuit found that, in a situation that "unfolded very rapidly and under less than ideal conditions[,]" police officers had adequately warned the decedent of the possibility of deadly force by approaching the decedent while armed and asking the decedent to show his hands. *McCullough v. Antolini*, 559 F.3d 1201 at 1207-1208 (11th Cir. 2009).

In this case, the armed Officers repeatedly yelled variations of "let me see your hands" and "Don't do it!" after they saw Kempf holding the knife. Defs.' SMF at ¶69, D.E.

19

59; Pl.'s SMF at ¶69, 137, D.E. 68. Moreover, prior to entering the Master Bedroom, Gilpin loudly told Kempf to exit the Master Bedroom with his hands up. Pl.'s SMF at ¶127, D.E. 68. Therefore, the Court finds, given the facts here, the Officers adequately warned Kempf about the possibility of deadly force. *Id.* at ¶136-137.

Plaintiff's Facts and the undisputed facts in Defendants' Facts establish that the Officers were forced to make split-second judgments. *See Graham*, 490 U.S. at 396-397. Plaintiff asserts that Gilpin should have waited until the second taser cycle had completed before firing her gun. Pl.'s Resp. at 7, D.E. 69. According to Plaintiff's Facts, Gilpin fired her gun .037 seconds after Rivera fired the second taser shot. Pl.'s SMF at ¶176, D.E. 68. Given the timing of the second taser and the timing of the fatal gunshot, as asserted by Plaintiff, the Court finds that Gilpin's decision to use lethal force was based on Kempf's physical movements, knife in hand, towards Rivera after his recovery from the first taser shot. The Court further finds that Gilpin's actions should not be judged through the prism of 20/20 hindsight. *See Shaw*, 884 F.3d at 1100. ("[I]t is doctrinal gospel that we do not view an officer's actions with 'the 20/20 vision of hindsight.'").

Based on the totality of the circumstances, the Court finds that Gilpin had probable cause to believe that Kempf posed a threat of serious injury or death to Rivera. *See Shaw*, 884 F.3d at 1099. As such, contrary to the argument in Plaintiff's Response, the undisputed

facts and the facts asserted by Plaintiff clearly demonstrate that Gilpin's actions were objectively reasonable.[12]

The facts in this case are analogous to *Shaw*. In *Shaw*, police officers shot and killed Shaw, a mentally ill man armed with a hatchet, who had failed to comply with the officers' repeated commands to drop the weapon. *See Shaw*, 884 F.3d at 1097-1098. At the time he was shot, Shaw was approaching one of the officers with the hatchet in his hand and telling the officers to "shoot it." *Id.* at 1097. Shaw was within five feet away when he was shot. *Id.* The Eleventh Circuit found that the officers' actions were objectively reasonable and upheld the district court's grant of summary judgment on qualified immunity grounds.[13]

Taking as true Plaintiff's assertions that Kempf "naturally moved forward" and "leaned forward toward Rivera" and "never walked or took any steps toward Officer Rivera threatening with a knife[,]" the Court's conclusion is unchanged. Pl.'s SMF at ¶164, 167, D.E. 68. The precedent set by the Eleventh Circuit in *Shaw* makes clear that where an armed, noncompliant, erratic, and mentally ill individual is within striking distance of an

---

[12] The Supreme Court's holding in *Scott* states that if a party's version of facts "is blatantly contradicted by the record, so that no reasonable jury could believe it," the Court should apply the facts as they appear in the uncontroverted record. *Scott*, 550 U.S. at 380-381. However, the *Scott* rule only applies where the accurate evidence "definitively established what happened and what did not." *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019). Neither Plaintiff nor Defendants dispute the authenticity or accuracy of the Cameras worn by Gilpin; and Defendants' Facts and Plaintiff's Facts both cite to the Cameras to support their factual statements. Upon the Court's review, the Gilpin Camera clearly shows that Kempf took a step forward after recovering from the first taser shot. Gilpin Camera at 17:30:05; and that as Kempf stepped into the Master Bedroom, he yelled "shoot" four times. *Id*. at 17:29:54. However, in this case, the Court makes its findings solely on the Plaintiff's asserted facts and the undisputed facts asserted by the Defendant.

[13] The Court notes that though Plaintiff avers that the cases relied upon by Defendants are distinguishable from the facts of the present case, Plaintiff's Response does not mention or attempt to distinguish the facts of *Shaw* from those of this case. *See* Pl.'s Resp. at 12-13, D.E. 69.

officer, it is reasonable for an officer to believe that the individual presents a serious threat of injury or death to the officer, and therefore, qualified immunity protects the use of deadly force. Per the Eleventh Circuit:

> On this occasion Shaw presented a clear danger. He was an armed and noncompliant suspect who had ignored more than two dozen orders to drop the hatchet. At the time he was shot, Shaw was advancing on Williams with hatchet in hand. He was close to him—within a few feet—and was getting closer still, yelling at Williams to 'Shoot it!' Shaw could have raised the hatchet in another second or two and struck Williams with it. Whether the hatchet was at Shaw's side, behind his back, or above his head doesn't change that fact. Given those circumstances, a reasonable officer could have believed that Shaw posed a threat of serious physical injury or death at that moment. A reasonable officer could have also concluded, as Williams apparently did, that the law did not require him to wait until the hatchet was being swung toward him before firing in self-defense.

*Shaw*, 884 F.3d at 1100.

The material differences between the facts of *Shaw* and those of the present case favor granting the MSJ. In *Shaw*, the police officers did not find themselves suddenly confronted with Shaw with only seconds to act. Instead, approximately two minutes transpired between when the officers encountered and shot Shaw. *Shaw*, 884 F.3d at 1097. In this time, the officers could have, but did not, take alternate actions, such as using a taser

22

to subdue Shaw. Instead, the officers pursued Shaw, who was walking away from them. *Id.* When the officers shot Shaw, they were not in a cluttered and congested bedroom. Rather, they were in an open area outdoors. *Id.*

In the present case, the Officers took multiple steps to avoid a violent confrontation with Kempf, repeatedly calling out for Kempf to show himself prior to entering the Residence and again before entering the Master Bedroom. Defs.' SMF at ¶41-44, 46-46, 51-52, D.E. 59; Pl.'s SMF at ¶41-44, 46-46, 51-52, 127 D.E. 68. The Officers did not use force until they were confronted in a cluttered room by Kempf, who was armed with a knife and within five feet of Rivera.

The Eleventh Circuit in *Shaw* made clear that "[e]ven with the benefit of hindsight and without making any special allowance, we would not find that Williams violated clearly established Fourth Amendment law. The shooting of a mentally ill man was tragic, as such shootings always are, but tragedy does not equate with unreasonableness." *Id.* at 1100-1101. The Court comes to the same conclusion here. Where the facts of the present case diverge from *Shaw*, such distinctions serve to strengthen the Court's conclusion.

As stated above, where police find themselves confronted by an armed, mentally ill individual, and the police use deadly force to subdue the individual, the decisive factor is the threat of physical harm the individual posed to others at the time of the use of force. *See Shaw*, 884 F.3d at 1099; *See also Mercado*, 407 F.3d at 1157. Here, the undisputed facts of this case show that Gilpin's belief that Kempf posed a serious threat of injury or

23

death to Rivera was objectively reasonable, and therefore, her use of deadly force was not unconstitutional.

### A.  The Cases Cited by Plaintiff are Inapposite

The Court further finds that the cases cited by Plaintiff are inapposite to the present case. Plaintiff chiefly relies on two cases, *Teel* and *Mercado*, to support her assertion that Gilpin violated Kempf's constitutional rights. The facts of both cases are clearly distinguishable from those in this case. In *Teel*, the police were called to perform a welfare check by the husband of a mentally ill woman, Teel, who had "possibly" harmed herself. *Teel v. Lozada*, 826 F. App'x 880, 881-882 (11th Cir. 2020). Teel was a 60-year-old woman who stood 5'2" and weighed 120 pounds. *Id.* at 883. The police officer who arrived at Teel's house shot her after giving her an order with which she complied. *Id*. While Teel was advancing toward the officer, she was approximately ten feet away from the officer. *Id*. at 886.

In reversing the district court's grant of summary judgment, the Eleventh Circuit held that "[p]erhaps most tellingly, Officer Lozada also was 'aware [and conceded] that alternative actions…were available means of resolving the situation.'" *Id*. Officer Lozada decided not to use them or attempt to de-escalate the situation as he had already drawn his gun. *Id*. at 886-887. Additionally, the officer admitted he had several paths to retreat, including going down the stairs or entering another room. *Id.* at 886. Instead, he shot her three times from approximately ten feet away without warning or reason. *Id*. at 887. Officer Lozada, as the Eleventh Circuit noted, had no objective facts indicating that Teel may be a

threat to anyone but herself. *Id.* at 886-887. In *Teel*, the Eleventh Circuit held that the "use of force was wholly unnecessary to any legitimate purpose." *Id.* at 889.

In contrast to *Teel*, the Officers in the present case attempted to communicate several times with Kempf prior to entering both the Residence and the Master Bedroom. Kempf did not respond to the Officers' attempts, nor did he comply with their directives. Here, unlike in *Teel*, Rivera used a non-lethal means of subduing Kempf before deadly force was used. Pl.'s SMF at ¶139, D.E. 68. Despite this attempt to subdue Kempf using a taser, Kempf kept hold the steak knife after the first taser shot, and leaned and moved forward while slightly bending at the waist. *Id.* at ¶152, 161, 163, 164, 165, 166, 170. This forward movement placed Kempf 4.7 feet from Rivera after the first taser shot. *Id.* at ¶169. As stated previously, Rivera was in a congested closet in a cluttered bedroom, and Nazario was standing by the Master Bedroom door, which was partially blocked by debris. *Id.* at ¶129, 131. As such, in addition to Kempf's close proximity to him, Rivera faced several impediments to any path of retreat or escape.[14] Based on the totality of the circumstances, the Court finds that, unlike the officer in *Teel*, Gilpin's conclusion that Kempf posed a "significant, immediate threat to [Rivera's] safety[,]" was objectively reasonable. *Teel*, 826 F. App'x at 886; Pl.'s SMF at ¶129, 131, 140, 163-164, 169, D.E. 68.

---

[14] Defendants claim that Rivera had "no escape" from his position in the closet, which Plaintiff disputes. Defs.' SMF at ¶77, D.E. 59; Pl.'s SMF at ¶77, D.E. 68. However, Plaintiff's Facts also establish that the closet doorway was congested, the room was cluttered, the Master Bedroom door was blocked by debris, and Nazario was standing in the doorway of the Master Bedroom. Pl.'s SMF at ¶129, 131, D.E. 68.

In *Mercado*, the police were called to perform a welfare check on Mercado, a suicidal man who was armed with a knife pointed at his chest. *Mercado*, 407 F.3d at 1154. Police ordered Mercado to drop the knife, with which order Mercado did not comply. *Id*. at 1554-1155. Approximately fifteen to thirty seconds later, the police shot him in the head from close range with a "sage launcher," a less-lethal weapon that is nonetheless not intended to be used against an individual's head at close range, resulting in severe brain injuries. *Id*. The Eleventh Circuit noted that "[t]argeting the head or neck with the baton or Sage SL6 projectile is acceptable in deadly force situations only." *Id*. at 1155. The Eleventh Circuit found that the use of the sage launcher in this fashion constituted unconstitutionally excessive force. *Id.* at 1158. The Eleventh Circuit also found that the facts of the case were "'so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point.'" *Id.* at 1160. Thus, the Eleventh Circuit reversed the district court's grant of summary judgment. *Id.* at 1161. However, as in *Teel, Mercado* has a facile similarity to the present case.

Unlike in the present case, the police found Mercado sitting on the floor and crying with a knife pointed at his chest. *Id.* at 1157-1158. In the fifteen to thirty seconds between when Mercado was given an order to drop the knife and when he was shot with the sage launcher, Mercado did not make any movements toward the police. *Id*. at 1157. Thus, even though Mercado did not comply with the police officers' commands to drop the knife, there was no basis for the police to believe Mercado was a threat to them. *Id*. at 1157-1158. As in *Teel*, the Eleventh Circuit stressed that less-lethal alternative actions were available to

26

the police officers and were not used. *Id.* at 1158. Importantly, the Eleventh Circuit found that the police officer waited only seconds after Mercado was instructed to drop the knife before employing the sage launcher, that the officer had been trained in the proper use of the weapon, and that the officer intentionally aimed for Mercado's neck or head area from close range, constituting lethal force.[15]

Plaintiff submitted as a supplemental authority the Eleventh Circuit case *Castro-Reyes v. City of Opa-Locka*, asserting that the case supports her argument that Kempf did not pose an immediate threat to the Officers and that the force used to subdue him was disproportionate and unreasonable. Pl.'s Not. at 2, D.E. 91. *Castro-Reyes*, like *Teel* and *Mercado*, bears only a shallow similarity to the present case.

---

[15] Plaintiff argues that Gilpin's training dictated that she should not have entered the Residence, as doing so compressed time and space, which is inadvisable when dealing with people suffering from a mental health crisis. Pl.'s Resp. at 14, D.E. 69. Plaintiff argues that Gilpin should instead have taken advantage of "trained Crisis Intervention officers" available for such instances. *Id*. As an initial matter, Plaintiff offers no support for her claim that crisis intervention officers were available to the Officers. *See* Pl.'s SMF, D.E. 68; Pl.'s Resp., D.E. 69. Further, in this instance, it appears Gilpin, unlike the officer in *Mercado*, followed her training. She and the other Officers were called to check on Kempf, who was reported as missing and suicidal. Pl.'s SMF at ¶97, 98, D.E. 68. The Grandmother told the Officers that Kempf was possibly armed with a knife. *Id*. at ¶106, 107. The Officers first discussed the possibility of calling Kempf by phone, until they learned Kempf did not have his phone with him. Gilpin BWC at 17:03:00. Before entering the Residence, the Officers called out to Kempf, attempting to coax him out of the Residence or communicate with him. Defs.' SMF at ¶41, D.E. 59; Pl.'s SMF at ¶41, D.E. 68. Kempf did not respond. Defs.' SMF at ¶42, D.E. 59; Pl.'s SMF at ¶42, D.E. 68. Before entering the Master Bedroom, the Officers again called to Kempf, asking him to exit the Master Bedroom. D.E. 68 at ¶127. Again, hearing no response, they entered the Master Bedroom where they encountered Kempf. Defs.' SMF at ¶52, D.E. 59; Pl.'s SMF at ¶52, D.E. 68. According to facts asserted or undisputed by Plaintiff, Gilpin and the other Officers attempted multiple means of communicating with Kempf prior to entering the Residence and the Master Bedroom. Even if the Court found that Gilpin erred by pushing into the Residence, the Court would not find that the error amounted to a violation of Constitutional rights. *See Powell*, 25 F.4th at 924 ("In hindsight, that decision may have been a mistake. But, of course, we 'do not view an officer's actions with the 20/20 vision of hindsight.' Qualified immunity leaves 'room for mistaken judgments.'") (citations omitted).

In *Castro-Reyes*, police officers attempted to involuntarily commit Castro-Reyes, who was suffering from a mental health episode. *Castro-Reyes v. City of Opa-Locka*, No. 24-12307, 2026 WL 318559 (11th Cir. Feb. 6, 2026). When the police officers found Castro-Reyes, he had been bound at the wrists and ankles with electrical wires and clothing cords by family members or friends. *Id.* at *3. The Eleventh Circuit upheld the district court's denial of summary judgment for two officers, finding that their actions were objectively unreasonable. *Id.* at *11-13. One of the officers repeatedly tased Castro-Reyes, who was already pinned to the ground by multiple officers. *Id.* at *11-12. Even though the first taser shot was effective in subduing Castro-Reyes, the officer continued to tase Castro-Reyes even after he was ordered to stop and until the taser's battery was drained. *Id.* The other officer repeatedly punched Castro-Reyes in the face while he was restrained by six other officers and not actively resisting. *Id.* at 13. The officer then dragged him by his ankles, causing him to hit his head on concrete stairs. *Id.* The Eleventh Circuit held that a reasonable jury could conclude that the officers each used excessive force when securing Castro-Reyes and emphasized that Castro-Reyes did not pose a threat to the officers. *Id.* at 11-13.

The facts of the present case are materially distinct from those in *Castro-Reyes*. When Kempf confronted the Officers, he was armed with a knife and moved in Rivera's direction. Pl.'s SMF at ¶133, 138, 140, D.E. 68. Kempf had ignored orders from the Officers to show himself, and to do so without the knife in hand. Id. at ¶127. Kempf was at no point physically restrained by any of the Officers. Although Kempf was under the

effects of the taser briefly, when Kempf recovered, he was 4.7 feet from Rivera. Id. at ¶163-164, 169.

While both Kempf and Castro-Reyes were erratic and suffering from a mental health episode, Kempf clearly posed an imminent threat to the Officers' safety, while Castro-Reyes did not. Therefore, the use of deadly force was objectively reasonable. Thus, *Castro-Reyes* is inapplicable to the present case.

For all of the above reasons, the Court finds that, based on the totality of the circumstances, Gilpin's use of deadly force was objectively reasonable. The Court further finds that Gilpin did not violate Kempf's Fourth Amendment rights to be free from unreasonable search and seizure, and Gilpin's use of deadly force was not excessive under the specific facts of this case.

### 2.   *There was no Violation of a Clearly Established Right*

Assuming, *arguendo*, that Gilpin's use of force violated Kempf's Fourth Amendment rights, Plaintiff would nevertheless have to demonstrate that the right was "clearly established" at the time of the violation. As stated above, Plaintiff can demonstrate the right was clearly established in one of three ways: (1) by pointing to a materially similar decision of the Supreme Court, of the Eleventh Circuit, or the Florida Supreme Court; (2) by establishing that a broader, clearly established principle should control novel facts; or (3) by showing that the facts so obviously violate the Constitution that prior case law is unnecessary. *Powell,* 25 F.4th at 920. While Plaintiff avers that she can demonstrate the

right was clearly established through each of the three methods, the Court rejects her assertions for the following reasons.[16] Pl.'s Resp. at 15, D.E. 69.

First, Plaintiff claims that *Mercado* and *Teel* are materially similar to the present case, as both cases involve police officers using deadly force against mentally ill individuals in crisis. *Id*. Plaintiff points out that, like Kempf, both Mercado and Teel were suicidal and each was armed with a knife. *Id*. In both cases, the police officer used deadly force against the mentally ill individual. *Id*. However, as discussed above, both cases are materially distinguishable from the present case. *See discussion above, supra* at 24-28. In both cases, the Eleventh Circuit held that there was no need to use the level of force deployed by the officers and that less deadly alternatives were available, but not considered by the officers. In this case, the Officers first tried to contact Kempf prior to entering the Residence and then continuously as they searched the Reisdence and again before entering the Master Bedroom to no avail. Defs.' SMF at ¶41-43, 60, D.E. 59; Pl.'s SMF at ¶41-43, 60, D.E. 68. Additionally, they followed the protocol for missing and endangered persons. Defs.' SMF at ¶38-39, D.E. 59; Pl.'s SMF at ¶38-39, D.E. 68. They also offered Kempf an alternative method of communication with the Officers to make contact by Kempf less challenging. Defs.' SMF at ¶45, D.E. 59; Pl.'s SMF at ¶45, D.E. 68. Further, the Officers

---

[16] Plaintiff filed a notice of supplemental authority asking the Court to consider the case *Atkins v J.G. Bennett*. Pl.'s Notice, D.E. 86. As an initial matter, *Atkins* is a district court case from the Middle District of Florida. *Atkins v. Bennett*, No. 3:23-CV-187-WWB-SJH, 2024 WL 4373371 (M.D. Fla. Oct. 2, 2024). As such, it is not binding upon this Court. Further, as the decision in *Atkins* was rendered after October 22, 2023, it cannot be considered in the Court's analysis of whether Gilpin's actions violated clearly established law. *Powell*, 25 F.4th at 920. Finally, the facts of *Atkins* are inapposite to those of the current case, and the decision is thus irrelevant to the Court's analysis.

agreed that Rivera would attempt to tase Kempf if they found him, and that Gilpin would only employ deadly force as a last resort, after Rivera's attempt at subduing Kempf failed. Pl.'s SMF at ¶119-120, D.E. 68.

Second, Plaintiff argues that she can show a broader, clearly establishing principle that controls the facts of this case. D.E. 69 at 15-16. In *Mercado*, the Eleventh Circuit held "[b]ecause this situation was clearly not a deadly force situation, and because the officers utilized deadly force to subdue Mercado, they violated the clearly established principle that deadly force cannot be used in non-deadly situations." *Mercado*, 407 F.3d 1160. The principle that deadly force cannot be used in non-deadly situations is certainly clearly established and can be traced at least as far back as *Garner*. *Garner,* 471 U.S. at 11. However, this clearly established principle does not apply to the facts of the present case. For the reasons outlined herein, based on the totality of the circumstances, including the several attempts by the Officers to communicate with Kempf, physical attributes of the room where the Officers came into contact with Kempf, the initial use of non-deadly force, as well as Kempf's actions and statements, clearly constituted a scenario where deadly force was justified. Defs.' SMF at ¶41-43, 60, D.E. 59; Pl.'s SMF at ¶41-43, 60, 119, 120, 127, 129, 131, 139, 163-164,  D.E. 68. Thus, deadly force was lawful, and the *Mercado* facts and principles cited by Plaintiff are inapplicable.

Finally, Plaintiff contends that even if there is no precedent directly on point, Gilpin's conduct was so egregious that constitutional rights were clearly violated. Pl.'s Resp. at 16, D.E. 69. This standard requires that the facts of a case "lie 'so obviously at the

31

very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" *Cantu,* 974 F.3d at 1234. Plaintiff points to *Teel*, where the Eleventh Circuit found that the police officer's conduct was so clearly egregious that it came within the "obvious clarity" rule. However, "[t]o come within the narrow exception, a plaintiff must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point." *Teel*, 826 F. App'x at 888. The present case does not fall within this narrow exception.

In *Kisela*, the Supreme Court held that a police officer was entitled to qualified immunity where he shot a mentally ill woman armed with a knife who was slowly advancing towards another individual and ignoring police commands to "take it easy." *Kisela v. Hughes*, 584 U.S. 100, 101-102 (2018). In that case, police responded to a report that a woman had been hacking at a tree with a knife and drew their guns shortly after arriving at the scene and spotting the woman armed with a knife. *Id*. at 101. The woman began to advance toward the other individual, with approximately six feet between the two. *Id.* at 101-102. The woman appeared calm but did not acknowledge the police officers. The officer, apparently fearing for the other individual's safety, shot the woman four times. *Id.* At the time of the shooting, the officers were not aware of any threats made by the woman, and the woman did not explicitly threaten the other individual during the interaction. *Id*. Nevertheless, the Supreme Court found that it was "far from an obvious case in which any competent officer would have known that shooting [the woman] to protect the [other

individual] would violate the Fourth Amendment." *Id.* at 105-106. The Supreme Court admonished lower courts "not to define clearly established law at a high level of generality." *Id*. at 104.

While the facts of the present case are somewhat analogous to those in *Kisela*, there are also distinctions. Hughes was approximately six feet from the other woman. *Id.* at 101. The police officers in *Kisela* did not attempt to use non-lethal means of subduing the woman. *Id*. at 102. The woman was calm during the encounter. *Id.* at 101-102. Thus, the Court concludes that the woman posed less of a threat to the other individual than Kempf did to Rivera. Nevertheless, the Supreme Court held that the officer was entitled to qualified immunity.[17] As such, even if the Court were to find that Gilpin's actions were unconstitutional, the Court finds that any competent officer would not necessarily have known that shooting Kempf was a constitutional violation. Even if the Court were to find that Gilpin's belief was mistaken, "[q]ualified immunity leaves 'room for mistaken judgments.'" *Powell*, 25 F.4th at 924. Ultimately, the question the Court is tasked with

---

[17] In *Kisela*, the Supreme Court discussed *Blanford*, an earlier Ninth Circuit case. *Kisela*, 584 U.S. at 106. In *Blanford*, police officers responded to a report of a man walking through a residential neighborhood. *Blanford v. Sacramento Cnty.*, 406 F.3d 1110 at 1112 (9th Cir. 2005). The man was carrying a two-and-a-half-foot-long sword and acting erratically. *Id.* When he refused to comply with the officers' commands to drop the sword, the officers shot him. *Id.* at 1113-114. The Ninth Circuit found that the officers were entitled to qualified immunity as the officers' belief that the man posed an immediate threat to others was objectively reasonable. *Id.* at 1116-1117. The Supreme Court, in *Kisela,* found that the officer who shot the woman armed with a knife could have relied on Blanford in their belief that their actions were objectively reasonable and the use of deadly force was justified. *Kisela*, 584 U.S. at 106. Given that the threat Kempf posed to Rivera was at least as great as the threat described in *Kisela*, the Court likewise finds that Gilpin could have relied on *Kisela* in her belief that her own actions were objectively reasonable.

answering is whether the state of the law in 2023 would have given Gilpin "fair warning" that her actions were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). To meet this standard, the unconstitutionality of Gilpin's actions must have been sufficiently clear that "every reasonable official would have understood that [Gilpin's actions] violated Kempf's rights." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation modified). Plaintiff falls well short of meeting this standard.

For these reasons, the Court finds that even if Gilpin had violated Kempf's Fourth Amendment rights, such rights were not "clearly established."

### b.  *Summary Judgment on Count I is Proper*

Because Gilpin did not violate Kempf's constitutional rights, Count I, alleging that Homestead is liable for Gilpin's actions, necessarily fails.[18] In *Howard*, the Eleventh Circuit held that "if a plaintiff fails to successfully allege an underlying constitutional violation by an agent of the county, the plaintiff's claim against the county fails as well." *Howard*, No. 23-11035, 2024 WL 1174021, at *3. While the claim against the defendant county in *Howard* was a *Monell* claim, the same analysis applies in the present case, where Plaintiff alleges a state law claim against Homestead for Gilpin's use of force. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, (1978). In *Clemons*, the Eleventh

---

[18] As previously stated, the Court proceeds with its analysis of Count I as a *Monell* claim. *See supra* at 6 n.7. However, even if the Court were to analyze Count I as if it were an excessive force claim, the Court would still grant summary judgment on Count I, as the "'clearly excessive' standard under Florida law is coextensive with the Fourth Amendment's 'excessive force' analysis." *Jean-Baptiste on behalf of Jean-Baptiste v. Jones*, 424 F. Supp. 3d 1251, 1263 (S.D. Fla. 2019). Simply put, because Gilpin did not use excessive force, Homestead cannot be held liable for excessive force under Florida law.

Circuit held that a state law claim under Fla. Stat. § 768.16 failed as the individual deputies had not violated any constitutional right. *Clemons v. Knight*, 662 F. App'x 725, 729 (11th Cir. 2016) ("The complaint against the Sheriff fails for related reasons. Because his deputies' actions did not violate Mitchell's and Gilmer's constitutional rights, the Sheriff cannot be faulted for inadequate supervision or training...And the district court correctly ruled that the Sheriff was not vicariously liable for battery because the deputies' use of force was not excessive or for wrongful death because Mitchell's death was not 'caused by a wrongful act.'") (citations omitted). Thus, Count I against Homestead fails as a matter of law.

## IV.    Conclusion

For the foregoing reasons, the Court:

**FINDS** that Gilpin was acting in her discretionary authority when she shot Kempf. The Court further

**FINDS** that Gilpin's use of deadly force was objectively reasonable, and **THEREFORE** there was no violation of Kempf's constitutional rights. The Court further

**FINDS** that Gilpin's actions did not violate clearly established law. The Court further

**FINDS** that the record taken as a whole could not lead a rational trier of fact to find for the non-moving party and that there is thus no genuine issue for trial. The Court further

35

**FINDS** that, as there was no violation of Kempf's constitutional rights, there is no basis for the state law claims. For these reasons, it is

**ORDERED AND ADJUDGED** that the Motion for Summary Judgment (D.E. 61) is **GRANTED** as to Counts I and II. All pending motions are **DENIED** as **MOOT**. The Court will enter Judgment by separate Order.

**UPON ENTRY OF JUDGMENT, THE CLERK IS INSTRUCTED TO CLOSE THIS CASE.**

**DONE AND ORDERED** in chambers in Miami this 12th day of March 2026.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**